IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                   No. CR 00-193 MV

STANLEY HOWARD SIMS,

    Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on seven motions filed by the Defendant, Mr.

Sims.  Based upon the motions, responses, replies, testimony in Court, and relevant case law, the

Court finds that: 1) Defendant's Motion To Suppress Warrantless Searches of the Defendant's

Office and All Fruits of Such Searches **[Doc. No. 27]** will be **denied in part as moot** and

**granted** in part; 2) Defendant's Motion to Dismiss Counts I and II **[Doc. No. 29]** is not well

taken and will be **denied**; 3) Defendant's Motion To Suppress Defendant's Statement and to

Suppress Searches Obtained by Defendant's Consent And All Fruits of Such Statement and

Searches **[Doc. No. 30]** will be **granted in part** and **denied in part**; 4) Defendant's Supplement

to his Motion to Suppress his Statement and to Suppress Searches Obtained by Defendant's

Consent and All Fruits of Such Statement and Searches **[Doc. No. 49]** is not well taken and will

be **denied**; 5) Defendant's Motion to Sever Counts I and II is not well taken and will be **denied**;

6) Ruling on Defendant's Motion In Limine to Exclude Internet Communications by Persons

Other than Defendant **[Doc. No. 50]** is **deferred**; 7) Defendant's Motion In Limine to Exclude

Contents of Search of Defendant's Office Computer on the Grounds That the Evidence Was Mishandled and Is Therefore Unreliable **[Doc. No. 52]** is **denied as moot**.

## BACKGROUND

Defendant Stanley Sims is a mechanical engineer.  During the time in which he was under investigation for the underlying offenses, he was employed by Westinghouse in their Waste Isolation Division to work on the federally-funded Waste Isolation Pilot Project (WIPP) in Carlsbad, New Mexico.  Westinghouse's work is under contract to the U.S. Department of Energy (DOE).  Mr. Sims is charged with two counts of knowingly engaging and attempting to engage in sexual acts with a juvenile female, who had attained the age of twelve years, but had not attained the age of sixteen years, and who was at least four years younger than him, in violation of 18 U.S.C. § 2242(b); and sending and receiving, in interstate commerce by computer, visual depictions of minors engaging in sexual explicit conduct, in violation of 18 U.S.C. § 2252(a)(1) and 18 U.S.C. §2252(a)(2).

The Federal Bureau of Investigation (FBI) first began to investigate Mr. Sims in December 1999.  On December 3, 1999, Detective McIlvray of the Carlsbad Police Department contacted the FBI regarding a report he had received from the National Center for Missing and Exploited Children.  This report contained details that Michael Walker had been on line on the Internet "chatting" with certain individuals, one of whom the FBI later found out to be Stanley Sims, the defendant.  Mr. Walker assumed two online personas, Sue and Kate.  According to testimony by FBI Agent Johnson, Mr. Walker presented "Sue" as a 16 years old girl and "Kate" as a 12 year old girl.  The FBI learned that Mr. Walker, posing as "Sue" and "Kate," received

sexually explicit e-mails and attachments containing images of child pornography from Mr. Sims over a period of two months.

When the FBI and the Carlsbad Police Department confirmed that Mr. Sims was one of the individuals sending sexually explicit material to Mr. Walker, they asked Mr. Walker to cease any contact with Mr. Sims, and told him that they (the FBI) were going to assume his online identity and continue communicating with Mr. Sims. They did so through an undercover computer in Maryland. Although the testimony at the hearing did not specifically state when, it appears that the FBI assumed Mr. Walker's identity sometime in December or January.  Through reading the e-mails sent to Mr. Walker, and through reading the e-mails that were sent to the FBI undercover computer, the FBI learned of Mr. Sims' attempt to meet with "Sue" and "Kate" while he was on a business trip in Springfield, Missouri in January 2000.

Meanwhile, the FBI and the Carlsbad Police Department were attempting to obtain the content of the sexually explicit e-mail messages through other means.  On or about January 7, 2000, Agent Johnson approached J.R. Galle, a federal security officer in the Carlsbad field office of the DOE, at a retirement party.  Agent Johnson requested his assistance in investigating Mr. Sims.  Agent Johnson told Mr. Galle that Mr. Sims, a Westinghouse employee, was using his WIPP computer to engage in illegal activity.  Agent Johnson asked Mr. Galle questions about the DOE's monitoring and detection capabilities, and asked Mr. Galle what information DOE or Westinghouse could provide the FBI in order to document Mr. Sims' potential criminal activity. Prior to this conversation with Agent Johnson, no one at WIPP had any idea that Mr. Sims was engaging in any illegal activity over his computer.

On January 10th, following up on his agreement with Agent Johnson to assist her in the

3

FBI's investigation of Mr. Sims, Mr. Galle directed Paul DeVito, the WIPP information systems security manager, to search Mr. Sims' computer and his e-mail account for any unauthorized or inappropriate activity. *See* 10/19/00 Tr. at 122. Mr. Galle told Mr. DeVito that the search was at the behest of the FBI. Mr. DeVito searched Mr. Sims' computer and his e-mail account on January 10th, through the server. *See* 10/19/00 Tr. at 125.

During the January 10th search, Mr. DeVito uncovered some sexually explicit e-mails and attachments involving young children in Mr. Sims' personal e-mail account. He made copies of e-mail attachments onto his laptop. He then contacted Mr. Galle, and told him that he "did have evidence of inappropriate activity." 10/19/00 Tr. at 127. On January 11th, Mr. Galle then showed Agent Johnson and Detective McIlvray, of the Carlsbad Police Department, the sexually explicit images on a screen on a laptop in Mr. Galle's office. Mr. Galle then furnished Agent Johnson and Detective McIlvray copies of the images on the screen on floppy disks. *See* 10/19/00 Tr. at 89.

On January 11th, at 9:00pm, Detective McIlvray, Mr. DeVito and Mr. Galle conducted a nighttime warrantless search of Mr. Sims' computer (this time through accessing Mr. Sims' actual computer) and office. Mr. DeVito turned and logged on Mr. Sims' computer. While on Mr. Sims' computer, he looked for photo files (files that end in ".jpg"). He found some sexually explicit images in Mr. Sims' temporary directory on his hard drive as well as his Internet temporary directory, so he made copies of those directories. *See* 10/19/00 Tr. at 131-135. Mr. DeVito also showed Detective McIlvray and Mr. Galle the sexually explicit images as he pulled them up from Mr. Sims' computer. Meanwhile, Detective McIlvray copied notes and post-its that were scattered about Mr. Sims' office, careful to return them to the same spot they had been

before so that Mr. Sims would not know that his office had been searched.  *See* 10/19/00 Tr. at 58-59.  Additionally, Mr. DeVito was told by either Detective McIlvray or Agent Johnson that there would be diskettes somewhere in Mr. Sims' office, and that he should find those.  *See* 10/19/00 Tr. at 137.  Mr. DeVito looked inside a closed cabinet door above Mr. Sims' computer and found 19 disks bound together by a rubber band.  Nothing on the outside of those disks suggested that they contained sexually explicit material.  Mr. DeVito made copies of those disks on a zip disk.  *See* 10/19/00 Tr. at 140. The search lasted about two hours.  All of the copied material was given to Detective McIlvray, who in turn contacted Agent Johnson.  None of the images copied from temporary files contained sexually explicit images involving children.  Therefore, Agent Johnson told Detective McIlvray that the FBI would not need those disks.  *See* 11/2/00 Tr. at 125.  After consultation with the FBI's Assistant Chief Division Counsel, David Vessel, Agent Johnson decided to destroy the copies of the 19 disks. She told Detective McIlvray that she was not going to view the copies of the 19 disks, and he destroyed them. *See* 11/2/00 Tr. at 120-21.

On January 20th, Agent Johnson secured an arrest warrant and a search warrant for Mr. Sims' office and computer from Magistrate Judge Deaton.  As of January 14th, the FBI undercover computer resumed communicating with Mr. Sims under the aliases of "Sue" and "Kate"; therefore, they monitored his travel plans to St. Louis. *See* 11/2/00 Tr. at 86.  Mr. Sims was scheduled to meet "Sue" and "Kate" at 4:00pm at a roller rink in St. Louis on January 22nd. When Mr. Sims showed up at the roller rink on January 22nd a few minutes past 4:00pm, he was arrested.   He was brought to an FBI field station.  Present in the interrogation room with Mr. Sims were Agent Johnson and Agent McLain of the FBI and Corporal Knowles, of the Missouri

5

State Highway Patrol.  The facts of interrogation are disputed and are set forth more fully in the discussion below.  As a result of the interrogation, Mr. Sims gave a statement, and gave his consent to search his belongings, car and hotel room.

At the same time that Mr. Sims was being questioned in Springfield, FBI agents and Carlsbad Police Department officers executed the search warrant for Mr. Sims' home computer. On January 25th, FBI agents executed the search warrant for Mr. Sims' office computer.  *See* 11/2/2000 Tr. at 89-90.  On February 17th, Agent Johnson secured a search warrant from Magistrate Judge Puglisi to search the contents of the 19 disks seized from Mr. Sims at the time of his arrest.  Also on February 17th, Agent Johnson secured another search warrant from Magistrate Judge Puglisi to search the contents of the server at PVT Networks for any images of child pornography or erotica.  None were found.  *See* Def. Ex. 3A, 4A and 4C.

## ANALYSIS

### I.  Motion To Suppress Warrantless Searches of the Defendant's Office and All Fruits of Such Searches [Doc. No. 27]

Defendant Sims seeks to suppress the warrantless searches of his office and the fruits of those searches.  There are two warrantless searches at issue:  a search of Mr. Sims' computer through the server on January 10, 2000, conducted by Paul DeVito, a Westinghouse employee, and a warrantless nighttime search of Defendant's office and computer on January 11, 2000, conducted by Detective McIlvray of the Carlsbad Police Department, Paul DeVito and J.R. Galle, a Department of Energy security officer.  The Government stated during the motions hearing that it does not intend to use any information obtained from the warrantless nighttime search on

January 11, 2000.  The Court is relying on this assertion by the Government, despite the fact that the Government stated in its Response to Defendant's Supplement to Motion to Suppress Searches of the Defendant's Office and the Fruits of All Such Searches that "the probable cause for [the] warrant [to search Mr. Sims' office] stemmed from the incriminating evidence that, during the January 11th warrantless search of Sims' office computer, had either been seized from Sims' computer hard drive or else was in plain view near the computer."  The Court is troubled that the Government asserts one thing in its pleadings and then says something else before the Court in the hearing.  However, taking the Government at its word at the hearing, the Court goes forward on the presumption that none of the information obtained from the January 11, 2000 search of Mr. Sims' office or his computer will be used at trial or was relied upon in the affidavit for probable cause, in the affidavit to obtain a warrant for the search of Mr. Sims' home, or in the arrest warrant.  Relying on the Government's statements that they will not use any information obtained from the January 11, 2000 search, the Court will deny that portion of Defendant's motion as moot.


## A.  Does the Fourth Amendment Apply?

With respect to the warrantless search of Mr. Sims' computer by Mr. DeVito on January 10, 2000, the Court finds that the search was conducted in violation of Mr. Sims' right to be protected against unreasonable searches and seizures under the Fourth Amendment to the United States Constitution.  To begin, the Court stresses what this case is and is not about:  it is about whether law enforcement officials may instigate and direct a warrantless search of an employee's computer, e-mail and Internet usage; it is not about whether an employer, on its own initiative,

may conduct a similar search.  The uncontroverted testimony presented in the motions' hearing was that the search of Mr. Sims' computer on January 10, 2000 by Mr. DeVito was done solely at the behest of law enforcement.  This was not a search conducted during the routine monitoring of an employee's computer use for work-related purposes, such as maintaining company security or efficiency.  Mr. Galle testified unequivocally that when he spoke to Agent Johnson at a party on January 7th, she requested his assistance in gathering information for her.  *See* 10/19/00 Tr. at 84.  This request for assistance by Agent Johnson triggered the entire investigation into Mr. Sims' computer, Internet and e-mail usage.  Before Mr. Galle's meeting with Agent Johnson, no one at Westinghouse or the Department of Energy knew of any improprieties concerning Mr. Sims.  In fact, Mr. DeVito testified that before January 7th no one at Westinghouse or the Department of Energy kept track of employee e-mails, as there was no system in place for doing so.  *See* 10/19/00 Tr. at 116.  Further, despite his testimony that he monitored the Internet usage of all 1,000 employees, second by second, three to four times a week, Mr. DeVito had not come across any improprieties regarding Mr. Sims' usage prior to the search initiated by the FBI.  After Mr. DeVito searched Mr. Sims' computer, Internet and e-mail accounts, the information was immediately turned over to Agent Johnson.   That this search was conducted solely for the benefit of law enforcement, and not for work-related purposes, is made clear by Agent Johnson's directive to Mr. Galle once Mr. DeVito found the images of child pornography on Mr. Sims' computer:

> Q:  Now when you -- on January 10th or 11th when you gave Agent Johnson
>
> these materials that had been gotten off the computer, she asked you not to notify
>
> management of DOE or Westinghouse; isn't that right?

8

A (by Mr. Galle):  That is correct.

Q:  In fact, you say a request was made by Agent Johnson that this information be kept law enforcement sensitive and take no action as far as formal reporting to management was concerned, right?

A:  That is correct.

Q:  And you honored her request?

A:  I did.

10/19/00 Tr. at 94.  There can be no dispute (indeed, the Government presented no evidence and made no argument) that the January 10th search at issue in this case was done at the behest of and for the sole benefit of law enforcement.

**1.  Private Actor v. Government**

It is well settled in Fourth Amendment jurisprudence that different standards apply depending on who initiates the search.  Private actors' conduct is generally not reviewable under the Fourth Amendment.  *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (stating that Fourth Amendment "is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official"); *Burdeau v. McDowell*, 256 U.S. 465 (1921). Whether a search is a private search and therefore outside the ambit of the Fourth Amendment, or a governmental search and therefore subject to the Fourth Amendment, depends on the extent of government involvement, if any, in the search.  The less that law enforcement is involved in the search, the less likely that a court will find the search to be governed by the Fourth Amendment. In *United States v. Hall*, 142 F.3d 988 (7th Cir. 1998), a computer repairman accessed files while

diagnosing problems with a computer.  The court found that the search was private and not subject to the Fourth Amendment, because "[t]he Government had no knowledge that Goodwin was going to repair Hall's computer and thus, did not instruct Goodwin to inspect the files."  *Id.* at 993.  Because the computer repairman's search was done during his employment and incident to his assigned duties (the defendant himself had requested the repairman's assistance), "the search was obviously a private search since it was not carried out by law enforcement officers, nor was it conducted under their direction; for Goodwin had not had any contact with law enforcement concerning Hall prior to the search."  *Id.* at 994.

In *United States v. Mendez-Jesus*, 85 F.3d 1 (1st Cir. 1996), the court held that evidence obtained as a result of a seizure is admissible where the seizure, though it may have assisted the Government, was made by a private person and "there is no suggestion that the government initiated or participated in the action."  *Id.* at 2.  In *United States v. Pervaz*, 118 F.3d 1 (1st Cir. 1997), the court held that the search was a private search where the secret service merely advised employees of a cellular phone company that the company's customers were being defrauded and asked if they had equipment to locate the source of the cloned calls.  The court held that the company's later use of such equipment was not a government search, as there was no evidence that the secret service agent "authorized the search or even knew about it."  *Id.* at 6.

In *United States v. Smythe*, 84 F.3d 1240 (10th Cir. 1996), the Tenth Circuit found that the search was a private search because the bus station manager testified that "the decision to open the package was entirely his," that he was not acting at the request or as an agent of the police in opening the suspicious looking package, and "that he would have opened the package regardless of whether the police responded to his call."  *Id.* at 1241.  The police became involved

10

only because the manager called them, and, once at the station, merely witnessed his opening of a suspicious looking package.  Similarly, in *United States v. Lefall*, 82 F.3d 343 (10th Cir. 1996), an air freight employee of an airline asked a police officer to witness the opening of a suspicious package.  The court stated for a private search to become government action, "[a] government agent must be involved either directly as a participant--not merely as a witness--or indirectly as an encourager of the private person's search before we will deem the person to be an instrument of the government."  *Id.* at 347 (citing *United States v. Walther*, 652 F.2d 788, 791 (9th Cir.1981)). The court found that this was a private search because the officer was present merely as a witness during the search.  *Id.* at 349.

The fact that this search was done at the behest of law enforcement rather than by the WIPP employees is a difference of constitutional magnitude.  In *Mancusi*, the Supreme Court found that the employee had an expectation of privacy against a search by law enforcement, but did not have such an expectation against his supervisors.  *See Mancusi*, 392 U.S. at 369; *see also United States v. Monroe*, 52 M.J. 326 (1999) (The defendant did not have a reasonable expectation of privacy in his e-mail messages or e-mail box as to employer's personnel, but "[t]he transmitter of an e-mail message enjoys a reasonable expectation that police officials will not intercept the transmission without probable cause and a search warrant").

A search by a private citizen becomes a governmental search implicating the Fourth Amendment "if the government coerces, dominates or directs the actions of a private person" conducting the search or seizure.  *Smythe*, 84 F.3d at 1242 (citing *Pleasant v. Lovell*, 876 F.2d 787, 796 (10th Cir.1989)).  This is because "government agents may not circumvent the Fourth Amendment by acting through private citizens."  *Id.* at 1243.  The Tenth Circuit stated that there

11

are two important factors to consider in determining whether a private person becomes an agent or instrumentality of the police for purposes of the Fourth Amendment:  whether "the government knew of and acquiesced in the intrusive conduct, and ... [whether] the party performing the search intended to assist law enforcement efforts or to further his own ends." *Smythe* at 1242 (citing *Pleasant* at 797; *United States v. Miller*, 688 F.2d 652, 657 (9th Cir.1982)).  Knowledge and acquiescence exist when a government agent affirmatively encourages, initiates or instigate the private action.  *Id.* at 1243 (citing *Pleasant* at 797-98).  A court must look to the totality of the circumstances to determine whether "the government coerces, dominates or directs the actions of a private person."  *Id.* (citations omitted).  "In some affirmative way, the police must instigate, orchestrate, encourage or exceed the scope of the private search to trigger application of the Fourth Amendment."  *Id.* (citing *United States v. Lambert,* 771 F.2d 83, 89 (6th Cir.)).

The search in this case was clearly done at the instigation of law enforcement.  Mr. Galle testified that Agent Johnson specifically requested his assistance in obtaining copies of the contents of Mr. Sims' e-mail and computer use, "in determining if there was any criminal activity."  *See* 10/19/2000 Tr. at 84.  Agent Johnson enlisted Mr. Galle's assistance to "document potential criminal activities."  *Id.* at 85.  Mr. Galle testified that prior to his conversation with Agent Johnson at the retirement party, neither he nor anyone at WIPP had any knowledge about Mr. Sims' improprieties.  *See id.* at 86, 88 (Mr. Galle had "no clue" that there was a problem with Mr. Sims before his conversation with Agent Johnson).  Mr. Galle in turn directed Mr. DeVito to conduct the search of Mr. Sims' computer.  *See id.* at 87.  When Mr. DeVito uncovered the sexually explicit images on Mr. Sims' computer, Mr. Galle immediately gave them to Agent Johnson and Detective McIlvray.  *See id.* at 89.  The testimony of Agent Johnson, Mr. Galle and

12

Mr. DeVito revealed that Mr. Galle and Mr. DeVito were in touch with either Agent Johnson or Detective McIlvray before and after each search.  The morning after Mr. DeVito conducted the search of Mr. Sims' computer, Agent Johnson, Detective McIlvray and Mr. Galle met to discuss how to gain additional information.  *See id.* at 90.   At every step of the way, Mr. Galle communicated with Agent Johnson or Detective McIlvray about the next step to take.  In fact, Agent Johnson requested that Mr. Galle not inform WIPP management about what they found because it was "law enforcement sensitive."  *Id.* at 94.  There can be no doubt that this search was instigated by law enforcement, done for the sole benefit of law enforcement, and, in the case of the January 11th search of Mr. Sims' office, even done with the participation of law enforcement.  Detective McIlvray accompanied Mr. Galle and Mr. DeVito during the January 11th search.  Therefore, the Fourth Amendment applies as it would to any other search by a law enforcement agency or official, even though the actual search was carried out by Mr. DeVito.  Therefore, this warrantless search was unconstitutional.

        If this court were to allow law enforcement to do what courts have allowed employers to do, this court would unilaterally amend Fourth Amendment jurisprudence to allow law enforcement to search an employee's workplace without a warrant.  The Government dismisses the fact that the search was done at the behest of law enforcement and for law enforcement purposes (so much so that the Government does not even address this fact in its Response).  But this is the key distinction.  A search may be valid for one purpose and valid when conducted by certain individuals, but invalid if done for another purpose and done by other individuals.  In *City of Indianapolis v. Edmond*, 121 S.Ct. 447 (2000), the Supreme Court reiterated the well established doctrine that certain searches, even though they were based only upon reasonableness

13

and conducted without a warrant, will still be upheld if they were conducted pursuant to a regime designed to serve "special needs, beyond the normal need for law enforcement." *Id.* at 451 (citing cases).  Similarly, in *Ferguson v. City of Charleston*, -- S.Ct. --, 2001 WL 273220, the Supreme Court held that because the *purpose* of the urine tests on pregnant women were to assist law enforcement, the searches must have been based upon probable cause and conducted pursuant to a warrant.  Thus, simply because someone could search Mr. Sims' computer does not mean that law enforcement could.  Nor can law enforcement get around the Fourth Amendment by directing an employer to do an illegal search for them.  The Fourth Amendment is not so easily circumvented.  The fact remains that this was a law enforcement search, and as such, should have been conducted pursuant to a warrant.

### 2.  Expectation of Privacy

### a.  Generally

Under the Fourth Amendment, it is well settled that before conducting a search, law enforcement officials must obtain a warrant, issued by a neutral magistrate upon a finding of probable cause, "instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14 (1948).  However, Fourth Amendment protections do not apply unless the citizen has a legitimate expectation of privacy in the place, object or person searched. *See O'Connor v. Ortega*, 480 U.S. 709, 715 (1987) (citing *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).  In determining whether a legitimate expectation of privacy exists, the Court must consider two factors:  (1) whether the defendant has manifested a subjective expectation of privacy in the object of the challenged search, and (2)

14

whether that expectation of privacy was objectively reasonable.  *See United States v. Gama-Bastidas*, 142 F.3d 1233, 1239 (10th Cir. 1998) (citing *California v. Ciraolo*, 476 U.S. 207, 211 (1986); *United States v. Arango*, 912 F.2d 441, 445 (10th Cir. 1990).  In a challenge to a search under the Fourth Amendment, the defendant has the burden of proof.  *See Rakas v. Illinois*, 439 U.S. 128, 131 n.1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure.")

In order to satisfy the first prong, a person must take "normal precautions to maintain his privacy."  *Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980).  In *United States v. Anderson*, 154 F.3d 1225 (10th Cir. 1998), the court found that the defendant had a subjective expectation of privacy and one that society was prepared to recognize as objectively reasonable because he took special precautions to maintain his privacy.  Defendant's workplace was searched.  The actions that the defendant took to maintain the privacy of his workplace were:  he entered the building during the holiday weekend using his corporate key card; no other employees were in the building; the door to the building locked behind the defendant; the defendant closed the door to the room; and attached a towel to one of the closed curtains to block further any view into room. *Id.* at 1233.

The Court finds that Mr. Sims established a subjective expectation of privacy in his e-mail, Internet and computer use generally, and in his office.  He testified that he thought that the content of his e-mails, his computer and his Internet searches were private.  He logged onto his computer and e-mail account with a password known only to him.  He did not show the contents of his e-mail or computer to anyone else in the office.  He testified that he logged off and shut

down his computer every day to maintain his privacy.  He complied with all of the Westinghouse

procedures imposed to keep the information on his computer secret.  *See* 11/2/00 Tr. at 27-30.

Therefore, the first prong is met.

 With regard to the second prong, the Court finds that Mr. Sims' expectation of privacy

was objectively reasonable.  Employees have a general expectation of privacy in their offices,

desks, and computers at work.  *See O'Connor v. Ortega*, 480 U.S. 709, 716 (1987); *Mancusi v.

DeForte*, 392 U.S. 364, 369 (1968).  "Such an expectation [of privacy] in one's place of work is

'based upon societal expectations that have deep roots in the history of the [Fourth]

Amendment.'"  *O'Connor*, 480 U.S. at 716 (quoting *Oliver v. United States*, 466 U.S. 170, 178,

n. 8 (1984)); *see also United States v. Anderson*, 154 F.3d 1225, 1230 (10th Cir. 1998) ("It is

well established that an employee has a reasonable expectation of privacy in his office."); *United

States v. Leary*, 846 F.2d 592, 595 (10th Cir. 1988) ("There is no doubt that a corporate officer

or employee may assert a reasonable or legitimate expectation of privacy in his corporate

office."); *Specht v. Jensen*, 832 F.2d 1516, 1520 (10th Cir. 1987).


**b.  Waiver - The Banner**

 The Government argues that the warning that popped up every time Mr. Sims accessed his

computer destroyed Mr. Sims' expectation of privacy.  As stated above, because this search was

instigated and directed by law enforcement, not the employer, the issue is whether this warning is

an effective waiver against law enforcement.  The Court finds that the banner did not waive Mr.

Sims' expectation of privacy as against law enforcement.  The warning stated:

  This is a Federal computer system and is the property of the United States

Government.  It is for authorized use only.  Users (authorized or unauthorized) have no explicit or implicit expectation of privacy.  Any or all uses of this system and files on this system may be intercepted, monitored, recorded, copied, audited, inspected and disclosed to authorized site, Department of Energy, and law enforcement personnel, as well as authorized officials of other agencies, both domestic and foreign.  By using this system, the user consents to such interception, monitoring, recording, copying, auditing, inspection and disclosure at the discretion of authorized site or Department of Energy personnel.  Unauthorized or improper use of this system may result in disciplinary action and civil and criminal penalties.  By continuing to use this system you indicate your awareness and consent to these terms and conditions.  LOG OFF IMMEDIATELY if you do not agree to the conditions stated in this warning.

United States' Response to Defendant's Motion to Suppress Warrantless Searches at 3.  In addition to this warning, Mr. Sims signed a "User Acknowledgment" of a WIPP company policy, in which the responsibilities of users of company computers was delineated.  The acknowledgment stated in pertinent part:  "I understand that I have no expectation of privacy (implied or otherwise) and that the use of DOE computer resources is subject to monitoring and review by authorized personnel."  *Id.*

As analyzed above, an employee may not have an expectation of privacy against his employer but may retain that expectation against law enforcement.  Some courts that have held that an employer may effectuate a waiver of its employees' expectation of privacy with a similar banner.  *See, e.g., United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000) (employee did not have a legitimate expectation of privacy against his employer because of Internet Use Policy which put employees on notice that employer could monitor Internet use).  In *Simons*, the employer happened upon sexually explicit material on Simons' computer when one of the computer technicians was testing the capabilities of a firewall.  *Simons*, 206 F.3d at 396.  The court found that the warrrantless search was constitutional solely because it was conducted by the

employer for the purpose of uncovering evidence of work-related misfeasance, rather than for law enforcement purposes. *Id.* at 400. Thus, while courts have held that such a banner is effective against an employment-related search, it does not follow that the banner waived Mr. Sims' expectation of privacy in this case, where the search was conducted at the behest of and for the benefit of law enforcement. Simply because WIPP officials may have been able to search Mr. Sims' computer for security or efficiency related reasons (and, once that legitimate work-related search revealed unlawful activity, would have been able to turn that information over to law enforcement), it does not follow that law enforcement officials could conduct, or direct WIPP officials to conduct, a warrantless search of Mr. Sims' computer, e-mail or Internet usage.[1]

By the terms of the banner itself, it is not an effective "waiver" of Mr. Sims' Fourth Amendment right to be free from unreasonable searches and seizures as against law enforcement. The language of the banner only allows "authorized site or Department of Energy" personnel to monitor the computer. The banner makes no mention that law enforcement may monitor the computer. The fact that the warning states that the employer may disclose the results of a search

---

[1] Nor is it the case that simply because Mr. Sims' employer could have seen what was on Mr. Sims' computer, or in his e-mails, he therefore relinquished his expectation of privacy. "[W]hat a person knowingly exposes to the public, even in his home or office, is not a subject of Fourth Amendment protection.... But what he seeks to keep as private, even in an area accessible to the public, may be constitutionally protected." *Katz v. United States*, 389 U.S. 347, 351 (1967). Mr. Sims, as discussed above, took care to preserve the contents of his computer and his Internet and e-mail usage private. The Court in *Mancusi* stated that:

> DeForte would have been entitled to expect that he would not be disturbed except by personal or business invitees, and that records would not be taken except with his permission or that of his union superiors. It seems to us that the situation was not fundamentally changed because DeForte shared an office with other union officers. DeForte still could reasonably have expected that only those persons and their personal or business guests would enter the office, and that records would not be touched except with their permission or that of union higher-ups. This expectation was inevitably defeated by the entrance of state officials, their conduct of a general search, and their removal of records which were in DeForte's custody.

*Mancusi*, 392 U.S. at 369.

18

to law enforcement merely reiterates the unremarkable principle that "Fourth Amendment concerns simply are not implicated 'when a private person voluntarily turns over property belonging to another and the government's direct or indirect participation is nonexistent or minor.'" *United States v. Smythe*, 84 F.3d 1240, 1243 (10th Cir. 1996) (citing *Pleasant v. Lovell*, 876 F.2d 787, 797 (10th Cir.1989)).  In this case, Mr. Galle and Mr. DeVito did not happen upon the sexually explicit content in Mr. Sims' computer in the course of their duties at WIPP, and then decide to turn it over to Agent Johnson or Detective McIlvray.  As articulated *supra*, this search was initiated by law enforcement and for the benefit of law enforcement.

Even if the banner were to be interpreted as waiving employees' expectation of privacy as against law enforcement, the Court would find that the waiver was unenforceable, for it would eviscerate Fourth Amendment protections beyond what has been recognized as reasonable.  The Government may not eliminate citizens' expectation of privacy simply by making an announcement that they have none.  The Supreme Court, in applying the *Katz* two-prong test, said that:

> Situations can be imagined, of course, in which *Katz'* two-pronged inquiry would provide an inadequate index of Fourth Amendment protection.  For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation of privacy regarding their homes, papers, and effects....  In such circumstances where an individual's subjective expectations had been "conditioned" by influences alien to Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining the scope of what the Fourth Amendment protection was.

*Smith v. Maryland*, 442 U.S. 735, 740 n.5 (1979).  This is such a circumstance where, if at all, Mr. Sims' expectation of privacy has been "conditioned" by influences alien to Fourth Amendment freedoms.  Therefore, even if Mr. Sims' expectation of privacy was affected by the

banner, that expectation could not play a meaningful role in determining the scope of Fourth

Amendment protections.  The Fourth Amendment cannot be so manipulated by the Government.

**B.  Consent**

The Government cannot get around the Fourth Amendment in this case by claiming that

Mr. Galle and Mr. DeVito consented to a search of Mr. Sims' computer.  *Mancusi* did not

address whether certain individuals would have had the authority to give consent to the search by

law enforcement:  "It is, of course, irrelevant that the Union or some of its officials might validly

have consented to a search of the area where the records were kept, regardless of DeForte's

wishes, for it is not claimed that any such consent was given, either expressly or by implication."

*Mancusi*, 392 U.S. at 369-70.  Mr. Sims argues that his employer was not authorized to give

consent to law enforcement to search his computer.  The Government does not adequately

respond to this argument.  It simply dismisses the consent argument as "irrelevant" because the

log-on message waived Mr. Sims' expectation of privacy.  The issue of consent is relevant,

although the Court finds that neither Mr. DeVito or Mr. Galle, acting on behalf of Mr. Sims'

employer, had the authority to consent to a search by law enforcement.

"When the prosecution seeks to justify a warrantless search by proof of voluntary consent,

it ... may show that permission to search was obtained from a third party who possessed common

authority over or other sufficient relationship to the premises or effects sought to be inspected."

*Matlock v. United States*, 415 U.S. 164, 171 (1974).  Even if consent is found, either implicitly or

explicitly, the search is limited to the scope of consent given.  *See United States v. West*, 219 F.3d

1171, 1177 (10th Cir. 2000) (citing *United States v. Pena*, 920 F.2d 1509, 1514 (10th Cir.

1990)).  The Court finds that the search exceeded the scope of consent in this case.

In this case, the scope of Mr. Galle's and Mr. DeVito's authority was to conduct a search for work-related purposes. By the terms of the banner and by the limits of the Fourth Amendment, they would only have had the authority to consent to a search that was done in the context of their authority as supervisors. The banner merely states that WIPP personnel may disclose what they find to law enforcement; not that they may allow law enforcement to search the computer. Further, the scope of their authority was limited by their purpose in conducting their search. Because the actual search that was conducted was for the purpose of discovering evidence to indict Mr. Sims in a crime, rather than for monitoring employee use of WIPP computers, proper consent was not given, and the search exceeded the scope of their authority.

Authority to search an area may be limited by the purpose for which the search is conducted. That is to say, a person may have the authority to search for one purpose but not another. Therefore, one may only have the authority to give consent to another if it is for the purpose that is within the ambit of his authority. *See Stoner v. California*, 376 U.S. 483 (1964) (hotel owner did not have authority to give consent to search guest's room despite that guest knew that cleaning staff could enter room); *Chapman v. United States*, 365 U.S. 610 (1961) (landlord did not have authority to give consent to search of tenant's premises despite landlord's right of entry). In *Chapman*, "before the officers made the forcible entry, the landlord did not know that the premises were being used for the manufacture of liquor, nor had he exercised his statutory option to forfeit the tenancy for such a cause." *Id.* at 618. The Court in *Chapman* stated that the landlord may have had the authority to enter the premises to abate the nuisance (to look for distilling equipment), but that did not give the landlord authority to consent to a search for law enforcement. Central to the Court's finding that the landlord did not have the authority to

21

consent to a search by law enforcement was that the landlord did not act within the scope of his authority. As the Court noted, the "purpose in entering was (not to view waste but) to search for distilling equipment." *Id.* at 616 (citing *Jones v. United States*, 357 U.S. 493, 500 (1958)). Further, the Court noted with concern that "to uphold such an entry, search and seizure 'without a warrant would reduce the (Fourth) Amendment to a nullity and leave (tenants') homes secure only in the discretion of (landlords).'" *Id.* at 616-17 (citing *Johnson v. United States*, 333 U.S. 10, 14 (1948). This Court will not leave employees' computers secure only in the discretion of their employers. To do so would destroy the well-settled principle that employees have a constitutionally protected expectation of privacy in the workplace.

*Stoner* and *Chapman* dovetail with the principle that activity by a private actor, when done in conjunction with, for the purpose of, and for the benefit of, law enforcement, is state action, and therefore subject to the Fourth Amendment. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 932-933, 941-942 (1982); *see also Blum v. Yaretsky,* 457 U.S. 991, 1004 (1982) (A state is held responsible for a private decision "when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State"); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970) (if a private party is "a willful participant in joint activity with the State or its agents," then state action is present); *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725 (1961) (state action is present if state "has so far insinuated itself into a position of interdependence" with  private party that "it must be recognized as a joint participant in the challenged activity"). Mr. Galle's and Mr. DeVito's conduct is circumscribed by the Fourth Amendment because they "jointly participated" in the law enforcement search.

The principle that there are differing constitutional inquiries depending on the purpose for which the search is conducted has been applied by the Supreme Court in the employment context as well. As the Court noted, "the reasonableness of an expectation of privacy, as well as the appropriate standard for a search, ... differ[s] according to context." *O'Connor*, 480 U.S. at 715. An employer may have the right to make intrusions in its capacity as an employer that it would not have if it was acting in a different capacity. The Supreme Court stated in *O' Connor* that "constitutional protection against unreasonable searches by the government does not disappear merely because the government has the right to make reasonable intrusions in its capacity as employer." 480 U.S. at 717; *see also id.* at 739 (Scalia, J., concurring).[2]

Generally, employees retain an expectation of privacy in the workplace. *See O'Connor*, 480 U.S. at 716; *Mancusi*, 392 U.S. at 369; *United States v. Anderson*, 154 F.3d at 1230; *United States v. Leary*, 846 F.2d at 595; *Specht v. Jensen*, 832 F.2d at 1520. *O'Connor* was the seminal employment case in a line of cases that recognized that administrative searches -- those that were

---

[2] In *O'Connor*, the employer was a government employer. The employer in this case is also a "government employer" because the WIPP project, although operated by Westinghouse, was a DOE project to dispose of nuclear waste generated by the Government. While the mere fact that WIPP is a government contract is insufficient to establish a private actor as a state actor, *see Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1448 (10th Cir. 1995), there is much more than a contract here. WIPP is a DOE project, heavily regulated and intertwined with the DOE. Additionally, Mr. Galle, who instructed Mr. DeVito to do the search, was a federal security officer with the DOE; Mr. Sims' e-mail account was a government account, ending in ".us"; and Mr. Sims used a DOE passkey to enter the building. Therefore, WIPP is "entwined with governmental policies" and the government was "entwined in [its] management or control." *See Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 121 S.Ct. 924, 930 (2001) (citing Evans v. Newton, 382 U.S. 296, 299, 301 (1966)). However, because the Court finds that the search was done at the behest of law enforcement, the Court does not base its decision on the fact that WIPP is a government employer for Fourth Amendment purposes. Nonetheless, the reasoning in *O'Connor* is instructive because it establishes the parameters of an employer's right to search an employee's workplace. Neither *Chapman* nor *Stoner* involved government entities; nonetheless, the authority of the landlord in *Chapman* and the motel owner in *Stoner* were circumscribed. They had no general authority to search; they only had the authority to search insofar as it was related to their ownership over the premises generally. Because their consent exceeded that scope, the Supreme Court found that the search violated the Fourth Amendment. Therefore, in this case, even if the Court were to treat WIPP as a private employer rather than a government employer, because the consent was for a law enforcement search, there are still limitations on its authority to search Mr. Sims' computer. *O'Connor* lays out those limitations.

for noninvestigatory purposes -- could be conducted in situations where a similar search by law enforcement could not be.  *See New Jersey v. T.L.O.*, 469 U.S. 325 (1985) (school officials); *Marshal v. Barlow's, Inc.*, 436 U.S. 307 (1978) (Occupational Safety and Health Act Inspectors); *Camara v. Municipal Court*, 387 U.S. 523 (1967) (building inspectors).  In *O'Connor*, the plaintiff, Dr. Ortega, sued his employer, a state hospital, for a search of his office.  The plaintiff was a physician and psychiatrist at the hospital.  Hospital officials, including Dr. O'Connor, the Executive Director of the hospital, became concerned about the propriety of Dr. Ortega's acquisition of a computer (which he said had been donated, but there was concern that Dr. Ortega had financed the computer through coerced contributions of residents), as well as charges that Dr. Ortega had sexually harassed two female hospital employees.  Dr. O'Connor requested that Dr. Ortega take paid administrative leave pending an investigation of the charges.  The hospital subsequently conducted a thorough search of Dr. Ortega's office and computer.  Dr. Ortega filed a civil § 1983 action, alleging that the hospital violated his Fourth Amendment right to be free from unreasonable searches and seizures.  The Supreme Court found that the warrantless search was justified by the governmental interest in the efficient and proper operation of the workplace.  *Id.* at 723.

It does not matter that the employer's reasons for conducting a search are also for discovering whether an employee has committed misconduct that is also criminal.  The key distinction is whether the search is for administrative purposes, or whether it is to aid law enforcement.  "We come to a similar conclusion for searches conducted pursuant to an investigation of work-related employee misconduct.  Even when employers conduct an investigation, they have an interest substantially different from 'the normal need for law

24

enforcement.'" *See O'Connor*, 480 U.S. at 724 (citing *New Jersey v. T.L.O.*, 469 U.S. at 351 (Blackmun, J., concurring). If the search is for work-related administrative purposes, the search will be upheld if it was reasonably related in scope to the administration of the workplace, even if it was not conducted pursuant to a warrant. However, if the search was conducted for law enforcement purposes, *i.e.* to assist law enforcement in a criminal investigation, it must be conducted with probable cause and pursuant to a warrant.

The Supreme Court in *O'Connor* held that an employer may conduct a search without a warrant, and are subject only to a reasonableness, rather than a probable cause standard. The Court balanced the employee's interest with the employer's interest in the efficient and proper management of the workplace. *See O'Connor*, 480 U.S. at 723 ("To ensure the efficient and proper operation of the agency, therefore, public employers must be given wide latitude to enter employee offices for work-related, noninvestigatory reasons.") The key element that led the court in *O'Connor* to hold that the search did not violate the Fourth Amendment was that the search was conducted for work-related purposes, not for law enforcement purposes. The Supreme Court's decision in *O'Connor* is replete with distinctions that the warrantless search was conducted for work-related purposes rather than for law enforcement: "The operational realities of the workplace ... may make some employees' expectation of privacy unreasonable when an intrusion is by a supervisor rather than a law enforcement official." *Id.* at 717; "While police ... conduct searches for the primary purpose of obtaining evidence for use in criminal or other enforcement proceedings, employers most frequently need to enter offices and desks of their employees for legitimate work-related reasons wholly unrelated to illegal conduct." *Id.* at 721; "In contrast to other circumstances in which we have required warrants, supervisors in offices

such as at the Hospital are hardly in the business of investigating the violation of criminal laws. Rather, work-related searches are merely incident to the primary business of the agency." *Id.* at 722; "Even when employers conduct an investigation, they have an interest substantially different from 'the normal need for law enforcement.'" *Id.* at 724; "In contrast to law enforcement officials, ... public employers are not enforcers of the criminal law.... In our view therefore, a probable cause requirement for searches of the type at issue here would pose intolerable burdens on public employers." *Id.* at 724.

Mr. Galle and Mr. DiVito, by virtue of the language in the banner and the proscriptions on their conduct under the Fourth Amendment, only had the authority to conduct a work-related search, one that was "incidental to the primary business of the agency." *See O'Connor* at 722. Had Mr. Galle or Mr. DeVito discovered the explicit images on Mr. Sims' computer during a routine searches of employees' e-mail, and then chose to turn over those images to law enforcement, this would be a much different case. The Court cannot impress enough the constitutional significance of the difference between that scenario and what actually happened in this case. There is a much less significant intrusion if a search is done by a supervisor than if by law enforcement. Additionally, as the Supreme Court in *O'Connor* stressed throughout its opinion, even if the intrusion is the same, courts have deferred to the administrative needs of employers in order to efficiently and properly run their office. The Court did not want to bar employers from being able to monitor employees' productivity or (mis)conduct. Nor did the Court find it feasible to subject the employer to the warrant and probable cause requirement. However, in this case, Agent Johnson directed the search. As a law enforcement official, there is simply no reason not to hold her to the warrant requirement. Because the search at issue in this

26

case, as has been articulated *supra*, was not a work-related search, but rather one done for the

benefit of law enforcement, Mr. Galle and Mr. DeVito were not acting within their authority.

Thus, they cannot have properly "consented" to the search on behalf of Mr. Sims.

      Because Mr. Sims had an expectation of privacy in his computer and e-mail, the Fourth

Amendment protections against unreasonable searches and seizures applies.  "The most basic

constitutional rule in this area is that 'searches conducted outside the judicial process, without

prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment --

subject only to a few specifically established and well-delineated exceptions.'" *Coolidge v. New*

*Hampshire*, 403 U.S. 443, 454-55 (1971) (citing *Katz v. United States*, 389 U.S. at 357).

Further,

> The point of the Fourth Amendment, which often is not grasped by zealous
> officers, is not that it denies law enforcement the support of the usual inferences
> which reasonable men draw from evidence. Its protection consists in requiring that
> those inferences be drawn by a neutral and detached magistrate instead of being
> judged by the officer engaged in the often competitive enterprise of ferreting out
> crime. Any assumption that evidence sufficient to support a magistrate's
> disinterested determination to issue a search warrant will justify the officers in
> making a search without a warrant would reduce the Amendment to a nullity and
> leave the people's homes secure only in the discretion of police officers.... When
> the right of privacy must reasonably yield to the right of search is, as a rule, to be
> decided by a judicial officer, not by a policeman or Government enforcement
> agent.

*Johnson v. United States*, 333 U.S. 10, 13-14 (1948).  In this case, the search of Mr. Sims'

computer on January 10, 2000 was done without a warrant, at the determination of Agent

Johnson.  The Government has not argued that any exceptions to the warrant requirement apply.

Because the January 10th search was in violation of Mr. Sims' Fourth Amendment right to be

protected from unreasonable searches and seizures, all of the evidence obtained from that search

should be suppressed as fruits of the poisonous tree.  *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

## C.  Suppression of Evidence

With that evidence suppressed, the question remains whether the search and arrest warrants that relied on that evidence are also invalid.  The arrest warrant and the search warrant that was obtained to search Mr. Sims' office, the disks that were seized during the search of his luggage and his home computer relied upon the evidence obtained as a result of the illegal search on January 10th.  *See* Defendant's Exhibit 1B, pp. 14-16.  The defendant argues that all of the subsequent warrant-based searches, and the fruits of those searches, should be suppressed as fruits of the poisonous tree. The Government has not contested this.  In fact, the Government has not addressed the issue at all.

"An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause.  If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid."  *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990) (citing *United States v. Karo*, 468 U.S. 705, 719 (1984)).  "To establish probable cause the remainder of the affidavit must contain sufficient facts to enable a reasonably prudent person to believe that a search of the described premises would uncover evidence of a crime."  *United States v. Hansen*, 652 F.2d 1374, 1386 (10th Cir. 1981) (citing *United States v. Burns*, 624 F.2d 95, 99 (10th Cir. 1980); *United States v. Neal*, 500 F.2d 305 (10th Cir. 1974)).  Probable cause exists where the evidence presented to the magistrate establishes a fair probability that contraband or evidence of a crime would be found in

the desired search area. *See United States v. Le*, 173 F.3d 1258, 1267 (10th Cir. 1999) (quoting

*United States v. Wittgenstein*, 163 F.3d 1164, 1171 (10th Cir.1998)).

The defendant also argues that the search and arrest warrants, and the evidence obtained

from them, should be suppressed because the FBI agent provided false information in the affidavit

to the Magistrate.  Specifically, Mr. Sims states that the warrant should be suppressed because

Agent Johnson did not state that the search occurred at the behest of law enforcement, and that

she mislead the Magistrate into thinking that the search occurred pursuant to a workplace search.

According to *Franks v. Delaware*, 438 U.S. 154 (1978), an affidavit supporting a search warrant

is presumed valid.  A defendant must make a "substantial preliminary showing" that:  (1) a false

statement was included in the affidavit; (2) the affiant made the false statement "knowingly and

intentionally" or with reckless disregard for the truth; and (3) the false statement was necessary to

the magistrate's finding of probable cause.  On the third factor, the *Franks* court said that "if,

when material that is the subject of the alleged falsity or reckless disregard is set to one side, there

remains sufficient content in the warrant affidavit to support a finding of probable cause, no

hearing is required."  *Id.* at 171. The defendant must prove the three factors by a preponderance

of the evidence to prevail.  *Id.*

Whether an affidavit contains incorrect or unconstitutionally-obtained information, the

ultimate analysis is the same:  a reviewing court must determine whether that information was

critical to establishing probable cause.  As stated above, if "the affidavit contained sufficient

accurate or untainted evidence, the warrant is nevertheless valid."  *Snow*, 919 F.2d at 1460.

Therefore, the Court will merge Mr. Sims' two claims together and perform one analysis.

The defendant has shown that the information obtained from the unlawful search of Mr.

Sims' computer on January 10th was information that was used to obtain the search warrant of

his home and the arrest warrant. The Government has not addressed the question whether any of

the information contained in the search warrant or affidavit of probable cause would have

inevitably been discovered, or whether the search or arrest warrants would stand without any of

the tainted evidence.  On its own review the Court notes that the affidavit to secure the search

warrant, contained detailed information about Mr. Sims' transporting e-mail messages to Mike

Walker, based upon information and disks obtained from Mr. Walker.  Agent Johnson testified

that the e-mails sent to Mr. Walker, and then to the FBI computer who assumed Mr. Walker's

identity, contained images of child pornography.  *See* 11/2/00 Tr. at 78-82; Def. Ex. 1B at 12.

Agent Johnson also testified that the e-mails sent by Mr. Sims, which were viewed on the

receiving rather than the sending end, contained detailed information about Mr. Sims' plans to go

to Springfield to meet with "Sue" and "Kate" and engage in sexual acts with them.  Agent

Johnson testified that she followed Mr. Sims to Springfield and observed him follow through with

his plan to meet the girls at 4:00 pm at the roller rink.  Mr. Sims wrote in an e-mail that he would

appear wearing a blue blazer.  When he arrived at the skating rink, he was wearing a blue blazer.

*See* Tr. 11/2/00 at 83-84.

        The Court finds that the information obtained from the e-mails that Mr. Sims sent to Mr.

Walker and then to the FBI informant computer, coupled with the FBI's confirmation of Mr.

Sims' plans to meet with "Sue" and "Kate" are sufficient to establish probable cause to arrest Mr.

Sims.  Therefore, the arrest warrant is valid.  As for the search warrant to search Mr. Sims' office

and home, similarly, the Court finds that the information contained in the affidavits was sufficient

to establish probable cause that there would be pornographic images on Mr. Sims' home and

office computer.

Even without the knowledge from the January 10th illegal search of Mr. Sims' office computer, the FBI still had sufficient information to present to the Magistrate that there were images of child pornography on Mr. Sims' office computer.  Agent Johnson testified that some of the e-mails that were sent to Mr. Walker came from Mr. Sims' work e-mail address.  *See* 11/2/00 Tr. at 79.  Also, there was at least one picture sent by Mr. Sims of himself in his office.  *See* Def. Ex. 1B at 14.  Therefore, as to the warrant issued for Mr. Sims' office computer, there was a sufficient nexus, independent of the information obtained as a result of the illegal search on January 10th, between the information sought and the place to be searched.   Accordingly, the search warrant for Mr. Sims' office will be upheld.

Similarly, there was sufficient information presented in the affidavit for the search warrant of Mr. Sims' home computer to establish probable cause that there would be contraband on his home computer.  In the affidavit for probable cause presented to the Magistrate, Agent Johnson states that Mr. DeVito recalled having a conversation with Mr. Sims about virus scanning programs for his home computer.  Therefore Mr. Sims had a computer at home.  Additionally, Agent Johnson relays that four e-mails, that were obtained either from Mr. Walker or through the FBI informant computer, sent by Mr. Sims, indicated that Mr. Sims was sending images of child pornography from his home rather than office computer.  *See* Def. Ex. 2B at 16-17.  Therefore, as to the warrant issued for Mr. Sims' office computer, there was a sufficient nexus, independent of the information obtained as a result of the illegal search on January 10th, between the information sought and the place to be searched.  The search warrant for Mr. Sims' home will also be upheld.

31

There were two other warrants issued in this case, neither of which were implicated by the January 10th illegal search of Mr. Sims' office computer.  One was the search of the PVT Network.  Since no contraband was found, there is nothing to suppress.  The other warrant issued was for the search of the 19 disks seized from Mr. Sims at the time of his arrest.  While there was information from the January 10th search relied upon in the affidavit, there was still sufficient information to establish probable cause that the 19 disks contained images of child pornography.  In her affidavit, Agent Johnson stated that a number of e-mails contained information that Mr. Sims would be bringing about 15 disks containing pornographic images to Missouri.  *See* Def. Ex. 3B at 14.  Mr. Sims gave his consent to the search of his hotel room, in which were found 19 disks.  Mr. Sims also stated in his statement to the police that the disks contained images of minors engaging in sexual acts.  *See id.*  However, this last piece of information cannot be considered in determining whether there was probable cause to search the disks, however, as this Court, as set out more fully below, finds that Mr. Sims' statement was obtained in violation of his Sixth Amendment right to counsel.  Excising the tainted information, however, this Court finds that there was sufficient information to establish by a fair probability that the 19 disks seized from Mr. Sims' hotel room contained images of child pornography.  Therefore, the Court  upholds that warrant as well.


## II.  Motion to Dismiss Counts I & II [Doc. No. 29]

The Defendant argues that Counts I and II, both of which contain as an element of the offense that the victim was under 18 years of age, should be dismissed because the person with whom the defendant was communicating was in reality a 53 year old man.  This argument is a

claim of factual impossibility.  However, factual impossibility is not a defense.  The Government is correct in noting that in a case of factual impossibility, the defendant may still be guilty of attempt.

Defendant also argues that Count I should be dismissed because the defendant did not "know" that the girl with whom he was communicating was under 18.  The defendant states that he thought the person with whom he was communicating was 18 years old, as evidenced by the Yahoo profile.  While there is a serious question as to whether the Government has any evidence that the defendant "knew" that the girl was under 18, this is more properly a fact question for the jury.

As to Count II, also, factual impossibility is not a defense.  As with Count I, while there may be a question as to whether Mr. Sims went to Missouri for the purpose of engaging in sexual acts with someone under 18, this is more properly a fact question for the jury.  Accordingly, defendant's motion to dismiss Counts I and II will be **denied.**

## III.  Motion To Suppress Defendant's Statement and to Suppress Searches Obtained by Defendant's Consent And All Fruits of Such Statement and Searches [Doc. No. 30]

Defendant argues that his statement given to the FBI, the search of his rental car, hotel room, briefcase, luggage and other personal belongings, and the fruits of those searches, should be suppressed.   Defendant argues that once he was arrested and brought into custody, he immediately invoked his right to counsel.  The Government argues that the Defendant did not request to speak with an attorney until after he voluntarily signed a statement and a consent to search form.

**A.  Defendant's Statement**

The Court finds that Mr. Sims invoked his right to counsel before he gave the statement to police, but after he signed the consent form to search his rental car, hotel room, briefcase, luggage and other personal belongings.  Therefore, his statement and the fruits of those searches must be suppressed.  When a suspect in custody makes a request for counsel, all questioning must cease. *Minnick v. Mississippi*, 498 U.S. 146 (1990); *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *Miranda v. Arizona*, 384 U.S. 436, 475 (1966) ("if the individual states that he wants an attorney, the interrogation must cease until an attorney is present").  As the Tenth Circuit said, a statement is presumed involuntary if police initiate questioning after a suspect requests counsel.  "[H]aving expressed his desire to deal with the police only through counsel, [an accused] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." *Pickens v. Gibson* , 2000 U.S. App. LEXIS 3442 (10th Cir. March 14, 2000) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)).  Once a suspect has requested counsel and it has not been provided, there is a constitutional violation and the evidence obtained as a result of the violation should be suppressed.  The Court does not undertake a voluntariness analysis.  *See United States v. Bautista*, 145 F.3d 1140, 1147 (10th Cir. 1998) ("If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards") (citing *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991)). "This is 'designed to prevent police from badgering a defendant into waiving his previously

asserted Miranda rights.'"  *McNeil*, 501 U.S. at 177  (citing *Michigan v. Harvey*, 494 U.S. 344, 350 (1990)).

The Government argues that if Sims made a request for counsel at all, it was equivocal. Citing *Davis v. United States*, 512 U.S. 452, 455 (1994), the Government correctly states that a request for counsel must be unequivocal for questioning to cease.  "A suspect must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  *Id.* at 459.

The Court finds that Mr. Sims invoked his right to counsel with sufficient clarity such that a reasonable police officer would have understood his statement as a request for counsel.  There is a dispute in this case about how and when Mr. Sims invoked his right to counsel.  The Court finds that considering the testimony of Mr. Sims and Agent Johnson, Mr. Sims' recollection of the interrogation is more plausible.  Agent Johnson testified that Mr. Sims asked if he would be given the choice of an attorney before he gave a statement, but that the conversation about which attorney he would choose, and his request to call his wife to try to get a hold of that attorney, did not occur until after Mr. Sims signed his statement.  If the Court were to credit Agent Johnson's recollection, the Court would have to believe that before Mr. Sims gave a statement, immediately after he read his advice of rights card telling him he had a right to an attorney, that he piped up with a vague, out-of-context question about whether he had a choice in attorneys, promptly dropped the subject to allow the interrogation to continue, and that only after he signed his statement, he began, again out of context, wondering what his attorney's name was, and asked to call his wife to be able to contact that attorney.  The Court finds it unlikely that the conversation about an attorney was disconnected in the manner remembered by Agent Johnson.  It makes

more sense that Mr. Sims, after reading his advice of rights card, asked for an attorney, and that the conversation about Mr. Sims' request for an attorney happened all at once.  This was Mr. Sims' testimony.

Mr. Sims testified that after he read his waiver of rights form, he immediately asked for an attorney.  "Q:  So explain what happened when you were given that form.  A:  I asked if I could call an attorney."  *See* 11/2/2000 Tr. at 45.  While it is true that at some points Mr. Sims stated he was not sure when he asked for an attorney, this uncertainty was whether he asked for an attorney before or after he signed the consent form to search his belongings.  At no point did Mr. Sims say he asked to speak to an attorney after he gave his statement.  On direct and redirect examination, and in response to the Court's questioning, Mr. Sims consistently maintained that he requested an attorney before his statement began.  On direct, he stated that the "first time" he asked for his lawyer was "just after I'd signed the piece of paper that they gave me and right before I made the statement."  *Id.* at 49.  On redirect Mr. Sims stated that the "initial" time he asked for his counsel was "before [he] made the statement."  *Id.* at 69.  In response to the Court's question, also, Mr. Sims stated that he asked for his lawyer before he gave his statement but after he signed the consent form.  *Id.* at 74.  Therefore, this Court finds that Mr. Sims' testimony is more believable than that of Agent Johnson's, and accepts as true Mr. Sims' version of the interrogation.

When Mr. Sims asked for an attorney, before his statement began, all questioning should have ceased.  *See Edwards*, 451 U.S. at 484-85.  Mr. Sims repeated his requests to speak to an attorney.  He even asked to call home to try to get a hold of his wife who knew how to get a hold of a particular attorney with whom he wanted to speak.  There was then an entire conversation with Agent Johnson about the identity of this attorney.  Mr. Sims testified that he then began

trying to think of a particular attorney's last name.  He knew his first name was Mike, and

described where his office was.  Agent Johnson asked if his last name was Stout, as she was from

Roswell and knew Michael Stout to be a prominent criminal defense attorney.  Sims testified that

he said to her, "that's the guy I want to get a hold of."  *See id.* at 48.  He then testified that he

wanted to call home, because his wife had Michael Stout's phone number, so that Michael Stout

could  "try to help me and represent me in this particular situation that I was involved in."  *Id.*

Mr. Sims then testified that a waiver form was put in front of him.  He stated that he wanted to

call his wife, who would have Michael Stout's phone number.  The Agents told him he could call

home later, after they took care of the statement and consent.[3]  *Id.* at 45.

      Throughout his direct testimony, Mr. Sims consistently maintained that he asked for an

attorney before he made his statement.  The Court finds as a factual matter that Mr. Sims made a

direct request for an attorney before he gave his statement to Agent Johnson.  To the extent that

there was contrary testimony, the Court, evaluates Mr. Sims' and Agent Johnson's testimony as a

whole, rather than forming a judgment based on any one statement made by them in isolation.

Moreover, the Court has considered the witnesses' demeanor and overall logic of their

recollection of events.  None of the contrary evidence undermines the Court's factual finding that

Mr. Sims made a direct request for an attorney before he gave a statement.  When Mr. Sims

---

[3]  Although the Government does not argue waiver, Mr. Sims did not waive his right to counsel by
continuing to talk to Agent Johnson about the name of his attorney.  While waiver occurs when "an accused ...
having expressed his desire to deal with the police only through counsel ... initiates further communication,
exchanges, or conversations with the police," *Edwards v. Arizona*, 451 U.S. at 484, Mr. Sims' comments and
questions to Agent Johnson were simply elaborations on his request for an attorney, not a desire to speak with law
enforcement without his attorney present. It appears that Mr. Sims thought he needed to have the name of a
specific attorney, and needed to be able to contact him right away, in order to have the assistance of an attorney
during questioning.  This of course is not the case.  As soon as Mr. Sims requested an attorney, all questioning
should have ceased.

requested a lawyer, questioning should have ceased.  Questioning did not cease when Mr. Sims

requested a lawyer.  The agents began their interrogation of Mr. Sims, which culminated in a

statement.  Because that statement was taken in violation of Mr. Sims' right to counsel, that

statement, and the fruits of that statement, should be suppressed.  *See Wong Sun v. United States*,

371 U.S. 471, 487-88 (1963).


**B.  Consent to Search**

        As for the consent to search his vehicle, hotel room and belongings, there was no

constitutional violation.  Mr. Sims argues that his consent to search was not voluntarily given.

The Court finds that Mr. Sims was not read his Miranda rights until after he signed the consent

form.  However, voluntariness is a question of fact to be determined by the totality of

circumstances.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *United States v.

Glover*, 104 F.3d 1570, 1583 (10th Cir.1997). "Supreme Court and Tenth Circuit precedent

establishes that '[c]onsent to search may be voluntary even though the consenting party is being

detained at the time consent is given,' and law enforcement agents fail to advise him of his

Miranda rights." *United States v. Dozal*, 173 F.3d 787, 796 (10th Cir. 1999) (citing *Doyle*, 129

F.3d at 1377; *United States v. Watson*, 423 U.S. 411, 424 (1976)); *United States v. McCurdy*, 40

F.3d 1111, 1118 (10th Cir.1994).  The Court went on in *Dozal*, "[t]he proper inquiry centers on

whether the defendant suffered, inter alia, 'physical mistreatment, use of violence or threats of

violence, promises or inducements, deception or trickery.'" *Id.* (citing *Glover*, 104 F.3d at 1584).

        In the Tenth Circuit, for a waiver to be voluntary, the totality of the circumstances must

show that "(1) the waiver was a product of a free and deliberate choice rather than intimidation,

coercion, or deception, and (2) the waiver was made in full awareness of the nature of the right being waived and the consequences of waiving." *United States v. Bautista*, 145 F.3d 1140, 1149 (10th Cir. 1998).  The totality of the circumstances include the suspect's age, intelligence and education, the length of detention, length and nature of questioning, whether the suspect was advised of his constitutional rights, and whether defendant was subjected to physical punishment. *See United States v. Erving L.*, 147 F.3d 1240, 1249 (10th Cir. 1998).  Although a suspect's "mental illness" may affect his ability to make a valid Miranda waiver, *see Colorado v. Connelly*, 479 U.S. 157, 162 (1986), the mental condition of a suspect does not control the "voluntariness" analysis. *Id.* at 164.  Absent a finding of police coercion, a waiver by a mentally impaired suspect will be upheld.  *See id.* at 165.

In this case, there was no evidence presented that the agents employed coercive tactics to obtain Mr. Sims' consent to search his belongings.  While there was evidence presented that Mr. Sims suffers from brain deterioration, Agent Johnson testified, and Mr. Sims did not present any evidence to the contrary, that the officers were unaware of Mr. Sims' dysfunction.  Moreover, co-workers of Mr. Sims testified that they did not observe Mr. Sims' impairments, so that it is reasonable that the law enforcement officers were not aware of Mr. Sims' difficulties.  While the Court does not dispute the doctor's conclusions that Mr. Sims suffers from brain deterioriation, such a finding is not dispositive on whether Mr. Sims voluntarily consented to the search of his belongings.  There must be some evidence that law enforcement exploited Mr. Sims' vulnerabilities in order to obtain his consent.  While they appeared to hurry him and told him that he might as well sign the form because they could get a search warrant anyway, such statements do not amount to coercion or exploitation.

Moreover, Mr. Sims' invocation of his right to counsel does not affect his consent to search. He testified repeatedly that he did not ask for an attorney until after he signed the consent to search form. Therefore, the evidence seized as a result of Mr. Sims' consent to search will not be suppressed.

## IV.  Supplement by Defendant re Motion to Suppress Defendant's Statement and to Suppress Searches Obtained by Defendant's Consent and All Fruits of Such Statement and Searches [Doc. No. 49]

Defendant argues that the information obtained as a result of the warrant should be suppressed because it was executed one day late. The Government argues that although the Magistrate set a date on which the warrant was to be executed, the Government had 10 days from the date the Magistrate issued the warrant. Defendant's reading of the case law is more sound as to the timeliness of the execution of the warrant. If Magistrate Judge Deaton set a date, then that is the date by which we determine timeliness. However, it was only one day late. The Tenth Circuit in *United States v. Colbert*, 635 F.2d 1387 (10th Cir. 1980), adopting the Second Circuit's interpretation of Rule 41, said that "courts should generally be 'wary in extending the exclusionary rule in search and seizure cases to violations which are not of constitutional magnitude.'" *Id.* at 1390 (citing *United States v. Burke*, 517 F.2d 377, 386 (2nd Cir. 1975)). The Tenth Circuit found that "violations of Rule 41 should not lead to exclusion unless (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." *Id.* The defendant has not met either prong. He has not shown that there was any prejudice to him in having the search executed one day late, nor was

40

any evidence of intentional and deliberate disregard of the Rule presented.  Therefore, Mr. Sims'

Supplement to his Motion to Suppress His Statement and to Suppress Searches Obtained by His

Consent and All Fruits of Such Statement and Searches will be **denied.**


## V.  Motion to Sever [Doc. No. 31]

A trial court has broad discretion in deciding whether to grant a severance.  *See Zafiro v.*

*United States*, 506 U.S. 534, 541 (1993); *United States v. Aguirre*, 108 F.3d 1228, 1233 (10th

Cir. 1997) (absent abuse of discretion, Court of Appeals will uphold a district court's decision on

severance motion).  Rule 8(a) of the Federal Rules of Criminal Procedure provides that:

> Two or more offenses may be charged in the same indictment or information in a
> separate count for each offense if the offenses charged, whether felonies or
> misdemeanors or both, are of the same or similar character or are based on the
> same act or transaction or on two or more acts or transactions connected together
> or construing parts of a common scheme or plan.

The Government argues that the crimes charged in the indictment evidence a common scheme or

plan by the defendant to engage in child pornography and the exploitation of children for sexual

gratification.

The court should not grant a severance unless "there is a serious risk that a joint trial

would compromise a specific trial right of one of the defendant's, or prevent the jury from making

a reliable determination about guilt or innocence."  *Zafiro*, 506 U.S. at 539.  The Tenth Circuit

mandates that "the prejudice resulting from a joint trial" be weighed "against the expense and

inconvenience of separate trials." *Aguirre*, 108 F.3d at 1233.  The defendant must make a "strong

showing of prejudice."  *United States v. Williams*, 45 F.3d 1481, 1483 (10th Cir. 1995).

The fact that evidence from one of the counts will "spillover" into another count is not

grounds to grant a severance motion.  *See Aguirre*, 108 F.3d at 1233.  However, a serious risk of

a compromise of a defendant's trial right is grounds to grant a severance.  Defendant argues that

he will be deprived of his right to testify as to Counts I and II if severance is not granted.

However, the defendant must proffer how joinder would unfairly prejudice his right to testify.

*See United States v. Martin*, 18 F.3d 1515, 1519 (10th Cir. 1994) (denial of severance upheld

because defendant failed to convincingly show that his testimony on a portion of the indictment

would be "important").  The defendant merely stated that he would testify as to Counts I and II,

but he did not proffer what his testimony would be or how his testimony to those Counts would

be important.  Therefore, defendants motion to sever Counts I and II will be **denied.**


## VI.  Motion In Limine to Exclude Internet Communications by Persons Other than Defendant [Doc. No. 50]

Defendant argues that e-mails sent from other people to Mr. Walker, the FBI informant,

are not relevant and are prejudicial.  The Government argues that it does not intend to introduce

these e-mails in its case-in-chief, but seeks to reserve the right to introduce them on cross-

examination or in rebuttal.  The Government says that it will alert the Court if such circumstances

arise.  Therefore, the Court reserves ruling on this issue.


## VII.  Motion In Limine to Exclude Contents of Search of Defendant's Office Computer on the Grounds That the Evidence Was Mishandled and Is Therefore Unreliable [Doc. No. 52]

Considering that this Court has suppressed the information obtained from Mr. Sims'

computer, this motion is **denied as moot.**

## CONCLUSION

**IT IS THEREFORE ORDERED** that 1) Defendant's Motion To Suppress Warrantless Searches of the Defendant's Office and All Fruits of Such Searches **[Doc. No. 27]** is **denied in part as moot** and **granted** in part; 2) Defendant's Motion to Dismiss Counts I and II **[Doc. No. 29]** is **denied**; 3) Defendant's Motion To Suppress Defendant's Statement and to Suppress Searches Obtained by Defendant's Consent And All Fruits of Such Statement and Searches **[Doc. No. 30]** is **granted in part** and **denied in part**; 4) Defendant's Supplement to his Motion to Suppress his Statement and to Suppress Searches Obtained by Defendant's Consent and All Fruits of Such Statement and Searches **[Doc. No. 49]** is **denied**; 5) Ruling on Defendant's Motion to Sever Counts I and II is **denied**; 6) Defendant's Motion In Limine to Exclude Internet Communications by Persons Other than Defendant **[Doc. No. 50]** is **deferred**; 7) Defendant's Motion In Limine to Exclude Contents of Search of Defendant's Office Computer on the Grounds That the Evidence Was Mishandled and Is Therefore Unreliable **[Doc. No. 52]** is **denied as moot**. The following items are hereby suppressed:

43

1.      All of the information seized from the January 10, 2000 search of Mr. Sims'
        computer by Mr. DeVito;

2.      Mr. Sims' statement given to the FBI on January 22, 2000.


_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE


Attorney for Government:                        Attorney for Defendant:
Tara Neda                                       Tova Indritz